1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBIE SUE JONES, | Case No. CV 16-5480-KK |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

Plaintiff Barbie Sue Jones ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency") denying her application for Title II Disability Insurance Benefits ("DIB"). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's decision is REVERSED and this action is REMANDED for further proceedings consistent with this Order.

///

///

///

---

[1] Pursuant to the request of the parties, the Court substitutes Nancy A. Berryhill, the current Acting Commissioner of Social Security, as Defendant in this action. Fed. R. Civ. P. 25(d).

## II.

## PROCEDURAL HISTORY

On April 23, 2013, Plaintiff filed an application for DIB, alleging a disability onset date of January 30, 2014[2]. Administrative Record ("AR") at 193-96. Plaintiff's application was denied initially on September 5, 2013, and upon reconsideration on February 3, 2014. Id. at 80-117, 122-130. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 131-36. On December 7, 2015, Plaintiff appeared with counsel and testified at a hearing before the assigned ALJ. Id. at 40-79. A vocational expert ("VE") also testified at the hearing. Id. at 67-78. On January 13, 2016, the ALJ issued a decision denying Plaintiff's application for DIB. Id. at 17-39.

On March 8, 2016, Plaintiff filed a request to the Agency's Appeals Council to review the ALJ's decision. Id. at 16. On May 23, 2016, the Appeals Council denied Plaintiff's request for review. Id. at 1-6.

On July 22, 2016, Plaintiff filed the instant action. ECF Docket No. ("Dkt.") 1, Compl. This matter is before the Court on the Parties' Joint Stipulation ("JS"), filed on April 13, 2017. Dkt. 15, JS.

## III.

## PLAINTIFF'S BACKGROUND

Plaintiff was born on July 31, 1964, and her alleged disability onset date is January 30, 2014. AR at 20, 195. She was forty-nine years old on the alleged disability onset date and fifty-one years old at the time of the hearing before the ALJ. Id. at 42, 195. Plaintiff completed two years of college and has work experience as a sales associate/distribution clerk and postal worker. Id. at 61, 91, 207. Plaintiff alleges disability based on "autoimmune disease, autoimmune

---

[2] Plaintiff amended her alleged onset date of disability at the December 7, 2015 hearing before the Administrative Law Judge.

condition, lupus, arthritis, osteoarthritis, fibromyalgia, chronic fatigue, anxiety/depression, fatty liver disease, asthma, and sarcoidosis." Id. at 225.

## IV.

## STANDARD FOR EVALUATING DISABILITY

To qualify for DIB, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity, and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

1. Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

2. Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

3. Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.[3]

4. Is the claimant capable of performing work she has done in the past? If so, the claimant is found not disabled. If not, proceed to step five.

---

[3] "Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's [residual functional capacity]," or ability to work after accounting for her verifiable impairments. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)). In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

5. Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

See Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

## V.
## **THE ALJ'S DECISION**

### A.    STEP ONE

At step one, the ALJ found Plaintiff has not engaged "in substantial gainful activity since January 30, 2014, the alleged onset date."  AR at 22.

### B.    STEP TWO

At step two, the ALJ found Plaintiff "ha[d] the following severe impairments: right knee derangement status-post arthroplasty, fibromyalgia, obesity, and depression."  Id.

### C.    STEP THREE

At step three, the ALJ found Plaintiff does "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Id.

///

**D.    RFC DETERMINATION**

The ALJ found Plaintiff had the following RFC:

to perform light work as defined in 20 CFR 404.1567(b) except she can

lift, carry, push or pull 20 lbs. occasionally and 10 lbs. frequently,

stand and walk for a total of 2 hours in an 8-hour day and sit 6 hours in

an 8-hour day and occasionally climb, balance, stoop, kneel, crouch,

and crawl.  [Plaintiff] can understand remember and carry out simple

work instructions with no interaction with the public and occasional

contact with supervisors and coworkers.

Id. at 25.

**E.    STEP FOUR**

At step four, the ALJ found Plaintiff is "unable to perform any past relevant work."  Id. at 31.

**F.    STEP FIVE**

At step five, the ALJ found "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  Id.   The ALJ, therefore, found Plaintiff not disabled.

**VI.**

**PLAINTIFF'S CLAIMS**

Plaintiff presents three disputed issues: (1) whether the ALJ's decision to afford little or no weight to the mental function assessments of Plaintiff's treating psychiatrist, Dr. James Jen Kin, is supported by specific and legitimate rationales; (2) whether the ALJ's decision to afford little or no weight to the physical function assessments of Plaintiff's treating rheumatologist, Dr. Jeremy Anuntiyo, is supported by specific and legitimate rationales; and (3) whether the ALJ's finding that the Plaintiff's subjective complaints are not credible is supported by clear and convincing evidence.

The Court finds the first and second issues dispositive of this matter and, thus, declines to address the remaining issue. See Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [Plaintiff's] alternative ground for remand.").

## VII.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).

"Substantial evidence" is evidence that a reasonable person might accept as adequate to support a conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Id. To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick, 157 F.3d at 720 (citation omitted); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (stating that a reviewing court "may not affirm simply by isolating a 'specific quantum of supporting evidence'" (citation omitted)). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Reddick, 157 F.3d at 720-21; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").

The Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." Orn v.

Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if it is "clear from the record" that the error was "inconsequential to the ultimate nondisability determination."  Robbins, 466 F.3d at 885 (citation omitted).

## VIII.

## DISCUSSION

## THE ALJ ERRONEOUSLY REJECTED DR. KIN AND
## DR. ANUNTIYO'S MEDICAL OPINIONS

### A.    RELEVANT FACTS

The ALJ reviewed Plaintiff's medical record, including treatment records from Dr. James Jen Kin, M.D. and Dr. Jeremy Anuntiyo, M.D.  AR at 23-24, 27-30. Dr. Kin is a psychiatrist who treated Plaintiff from November 2013 through the time of the ALJ hearing.  Id. at 55, 815-20, 1163-85, 1593-97.  Dr. Anuntiyo is a rheumatologist who treated Plaintiff from March 2012 through the time of the ALJ hearing.  Id. at 298-514, 646-808, 823-1010, 1012-1147, 1156-62, 1388-1467, 1588-92.  The ALJ rejected the opinions of both treating physicians in favor of consultative physicians.  Id. at 24, 30.

### B.    APPLICABLE LAW

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725. The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

While an ALJ is not required to discuss all the evidence presented, he must explain the rejection of uncontroverted medical evidence, as well as significant probative evidence. Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citation omitted). Moreover, an ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings. See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others).

Lastly, while an ALJ is "not bound by an expert medical opinion on the ultimate question of disability," if the ALJ rejects an expert medical opinion's ultimate finding on disability, he "must provide 'specific and legitimate' reasons for rejecting the opinion." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995), as amended (Apr. 9, 1996)). An ALJ is not precluded from relying upon a physician's medical

findings, even if he refuses to accept the physician's ultimate finding on disability. See, e.g., Magallanes v. Bowen, 881 F.2d 747, 754 (9th Cir. 1989).

**C. ANALYSIS**

As discussed below, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting Dr. Kin and Dr. Anuntiyo's opinions.

**1. Dr. James Jen Kin, M.D.**

**(a) Dr. Kin's Findings and Opinions**

Dr. Kin began treating Plaintiff on November 26, 2013. AR at 815, 1183. At that time, Dr. Kin observed Plaintiff was guarded, had retarded psychomotor activity, had a depressed mood, and had a depressed, anxious, labile, and irritable affect. Id. Dr. Kin diagnosed major depression. Id. at 817, 1185. In his December 2013 examination of Plaintiff, Dr. Kin noted similar observations, with the addition of a paranoid thought content. Id. at 817, 1182. By his January 2014 examination of Plaintiff, Dr. Kin noted fewer objective symptoms. Id. at 819, 1180.

In February 2014, Dr. Kin noted Plaintiff exhibited increased objective symptoms of depression. Specifically, Dr. Kin reported Plaintiff was again guarded with retarded psychomotor activity, her mood was depressed and angry, and her affect was depressed, anxious, labile, and hostile. Id. at 1177. She exhibited a paranoid thought content, as well as poor insight and judgment. Id. Dr. Kin reported even greater objective symptoms in his March 2014 examination of Plaintiff. In addition to many of the symptoms she exhibited in February 2014, Plaintiff was now tearful and irritable, and was suffering from auditory hallucinations. Id. at 1175.

In June 2014, Dr. Kin completed an "Impairment Questionnaire." Id. at 1163-67. While the questionnaire focused, in part, on Plaintiff's physical impairments, id. at 165-66, Dr. Kin also listed major depression as a diagnosis, detailed Plaintiff's emotional symptoms, and reported how Plaintiff's mental

9

impairments would be expected to limit her work activity.  Id. at 1163-64, 1167.  In addition, in treatment notes from that month, Dr. Kin reported that Plaintiff was guarded, showed psychomotor retardation, had a depressed mood, and her affect was depressed, anxious, labile, and irritable.  Id. at 1172.  She exhibited paranoia, but her insight and judgment were fair.  Id.

By July 2014, Plaintiff showed improvement.  Dr. Kin reported normal psychomotor activity, a "slightly better" mood, and fair insight and judgment.  Id. at 1170.  However, her affect remained depressed, anxious, labile, and irritable, and her paranoid thought content persisted.  Id.  In October 2014, Dr. Kin reported similar symptoms, although Plaintiff's paranoia had subsided.  Id. at 1168.

In his September 2015[4] mental impairment questionnaire, Dr. Kin reported Plaintiff suffered from major depression, as exhibited by symptoms of depressed mood, anxiety, feelings of guilt or worthlessness, psychomotor agitation, oddities of thought, irrational fears, and sleep disturbances.  Id. at 1594.  Dr. Kin reported that Plaintiff decompensates in a work-like setting, resulting in exacerbated symptoms.  Id. at 1595.  Dr. Kin reported that Plaintiff suffered from marked limitations in her ability to remember locations and work-like procedures, and to understand, remember, and carry out one-to-two step instructions.  Id. at 1596.  Dr. Kin further concluded Plaintiff suffered from moderate-to-marked limitations in all other categories[5].  Id.  Dr. Kin estimated Plaintiff would miss work more than three times a month due to her impairments or treatment.  Id. at 1597.

---

[4] The record does not contain treatment notes from Dr. Kin for the months between October 2014 and September 2015.  However, in his September 2015 mental impairment questionnaire, Dr. Kin reported he last examined Plaintiff in July 2015.  Id. at 1593.

[5] The other categories included assessments of Plaintiff's concentration and persistence, ability to socially interact, and ability to adapt.  Id.  Within those categories, there were sub-categorical assessments of Plaintiff's ability to, among others, carry out detailed instruction, maintain attention and concentration for extended periods, complete a workday without interruptions from psychological symptoms, perform at a consistent pace without rest periods of unreasonable length or frequency, interact appropriately with the public, maintain socially

### (b) Consultative Examiner's Findings and Opinions

Consultative psychiatrist, Sohini P. Parikh, M.D., examined Plaintiff on August 6, 2013. Id. at 562-68. Dr. Parikh reported Plaintiff was able to focus during the examination, could complete household tasks, could follow simple oral and written instructions, and did not have difficulty making decisions. Id. at 564, 565. Plaintiff could repeat four of six digits forward, and two of three digits backward. Id. at 565. Plaintiff's "mood was depressed. [But her] affect was brighter." Id. She denied feelings of hopelessness, helplessness, anhedonia, and worthlessness. Id. Plaintiff's thoughts were logical and she denied hallucinations. Id. Dr. Parikh found Plaintiff's insight in the average range and her memory was intact. Id. at 566. Dr. Parikh diagnosed "Mood disorder, because of medical condition." Id.

Dr. Parikh concluded Plaintiff suffered from mild limitations in her ability to maintain social functioning; understand, remember, and carry out complex instructions; respond to coworkers, supervisors, and the general public; respond appropriately to usual work situations; and deal with change in a routine work setting. Id. at 567-68. According to Dr. Parikh, Plaintiff suffered from repeated episodes of mild emotional deterioration in work-like situations. Id. at 567.

### (c) Third Party Function Report

Plaintiff's husband completed a third party function report, detailing his observations of Plaintiff's functional capacity. Id. at 228-36. He stated Plaintiff tires easily and has trouble with her knees giving out. Id. at 228. He described Plaintiff's daily routine as "watch[ing] TV then get[ting] back in bed." Id. at 229. He explained Plaintiff has trouble sleeping and dressing herself, and needs help with her hair. Id.

---

appropriate behavior, respond appropriately to workplace changes, and make plans independently. Id.

Plaintiff's husband stated Plaintiff cooks when she has the energy, "maybe once per week." Id. at 230. He stated she does not do household chores. Id. at 230-31. He further explained Plaintiff leaves the house only for church and medical appointments, but can go out alone and is able to drive. Id. at 231. Plaintiff shops online for 30 minutes every three to six months. Id. She is able to handle her finances, but get confused easily. Id. at 231-32. He stated Plaintiff's hobbies include reading and watching TV, and she engages in these activities "whenever she can stay awake long enough to do them." Id. at 232. He explained that physical activities like "lifting, squatting, bending, standing, walking, stair climbing, and using [her] hands, cause[s] swelling" and, consequently affects many of her physical activities. Id. at 233. Additionally, fatigue limits her ability to complete tasks, concentrate, and follow instructions. Id.

Plaintiff's husband estimated Plaintiff can walk about 100 yards, after which she needs to rest about 10-15 minutes. Id. She can only pay attention for about two hours before falling asleep. Id. If she is well rested, she can follow written instructions, and she can follow spoken instructions once she understands them. Id. He explained that Plaintiff exhibits anxiety and does not handle changes in routine well. Id. at 234.

### (d)    ALJ's Rejection of Dr. Kin's Opinion

The ALJ rejected the opinion of treating physician, Dr. Kin, in favor of consultative physician, Dr. Parikh. Id. at 24. First, the ALJ gave little weight to treating physician, Dr. Kin's June 2014 impairment questionnaire because it "is beyond his specialty as a psychiatrist." Id. Second, the ALJ gave little weight to Dr. Kin's September 2015 findings regarding Plaintiff's mental impairments because the doctor's assessment was "inconsistent with the clinical signs in his treatment record, the reports of claimant's functioning [as reported by her husband] and the findings of Dr. Parikh in her evaluation of the claimant." Id. at 24.

(e)     **Analysis**

Dr. Kin's opinions were contradicted by Dr. Parikh's findings.  Thus, in order to reject Dr. Kin's opinions, the ALJ was required to present "specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim, 763 F.3d at 1160-61; Garrison, 759 F.3d at 1012.  As discussed below, although the ALJ presented specific reasons, the reasons were neither legitimate nor supported by substantial evidence in the record.

First, the ALJ's outright rejection of Dr. Kin's June 2014 assessment on the grounds that his physical impairment assessment is beyond his expertise as a psychiatrist overlooks the fact that he also assessed Plaintiff's mental status within the questionnaire.  Thus, this was neither a specific nor a legitimate reason for rejecting Dr. Kin's psychiatric assessment within the June 2014 questionnaire.

Next, the ALJ did not give sufficient reasons for rejecting Dr. Kin's September 2015 mental impairment assessment.  Contrary to the ALJ's conclusion, Dr. Kin's findings and opinions were not inconsistent with the clinical signs in his treatment record.  As detailed above, Dr. Kin treated Plaintiff for over two years, and consistently found Plaintiff to be suffering from significant symptoms of depression, including psychomotor retardation; a depressed, and sometimes angry, mood; and a depressed, anxious, labile, hostile, and irritable affect.  AR at 815, 817, 1168, 1170, 1175, 1177, 1182-83.  In addition, on multiple occasions, Plaintiff exhibited a paranoid thought content, id. at 817, 1170, 1177, 1182; and on at least one occasion, Dr. Kin reported Plaintiff suffered from auditory hallucinations.  Id. at 1175.  These significant clinical signs supported Dr. Kin's opinions regarding Plaintiff's mental functional capacity.

Second, Dr. Kin's assessment was not inconsistent with the third party function report completed by Plaintiff's husband.  Based on the report from Plaintiff's husband, the ALJ concluded Plaintiff could attend to personal care (but

13

had difficulty dressing), prepare simple meals, drive, shop online, and manage finances. Id. at 23.  The ALJ concluded these activities are inconsistent with Dr. Kin's opinions. Id. at 23-24.  While the third party report supports a finding that Plaintiff can carry out these tasks, Plaintiff's husband reported limitations, particularly regarding the rate and pace Plaintiff does them.  For example, Plaintiff can take care of her own basic care, but has difficulty dressing and needs help with her hair. Id. at 229.  She can prepare simple meals, but cooks at most once a week due to fatigue. Id. at 230.  She is able to drive, but only leaves the house for church and medical appointments. Id. at 231.  In addition, her online shopping lasts about 30 minutes and occurs every three to six months. Id.  Finally, while generally she can manage her own finances, she gets confused easily when handling money. Id. at 231-32.  Ultimately, limited activities of daily living reported by Plaintiff's husband are not inconsistent with Dr. Kin's findings of significant impairment.

Finally, the ALJ is correct to point out that Dr. Kin's opinions are inconsistent with Dr. Parikh's opinions.  However, such a finding merely lowers the standard by which the ALJ could reject Dr. Kin's opinion, but it is not a legitimate reason in itself for rejecting Dr. Kin's opinions. See Orn v. Astrue, 495 F.3d 625, 633 (2007) ("As we stated in Reddick, 'Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record.'" (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted))).

2.      **Dr. Jeremy Anuntiyo, M.D.**

(a)      **Dr. Anuntiyo's Findings and Opinions**

Dr. Anuntiyo began treating Plaintiff on March 28, 2012.  At that time, Plaintiff presented to Dr. Anuntiyo with a rheumatological disorder involving her hands, elbows, shoulders, spine, knees, ankles, and feet. AR at 374, 736, 1465. Plaintiff complained of fatigue, malaise, sleep disturbances, arthralgias, and

myalgias.  Id. at 347, 736, 926, 1465.  Plaintiff exhibited tenderness in her finger joints.  Id. at 928, 1466.  Dr. Anuntiyo suspected undifferentiated connective tissue disease and fibromyalgia.  He prescribed prednisone.  Id. at 377-78, 928, 1467.

In April 2012, Dr. Anuntiyo reported having reviewed Plaintiff's past medical records, which showed Plaintiff's erythrocyte sedimentation rate ("ESR") testing in the "40's and 50's."  Id. at 370, 373, 513, 733, 923, 1462; see id. at 488, 496.  Plaintiff tested negative for the rheumatoid factor ("RF") and anti-nuclear antibody ("ANA"), although her ANA had been "mildly elevated" in the past.  Id. at 370, 373, 733, 735, 923, 1462.  Plaintiff complained of pain "in several joints" and "AM stiffness."  Id. at 373, 733, 1462.  She tested positive for eight fibromyalgia tender points.  Id. at 372, 734, 924, 1463.  Dr. Anuntiyo reported Plaintiff's polyarthritis was "steroid-responsive."  Id. at 373, 513, 735, 925, 1464.

In May 2012, Plaintiff reported feeling better, but continued to exhibit joint tenderness in her fingers.  Id. at 366, 368, 730-31, 920-21, 1459-60.  Dr. Anuntiyo suspected Plaintiff was suffering from fibromyalgia and inflammatory polyarthritis, but could not rule out sarcoidosis or undifferentiated connective tissue disease.  Id. at 369, 732, 922.

In June 2012, Plaintiff reported not feeling well after tapering her prescribed prednisone.  She was experiencing joint pain, and increased fatigue, tiredness, and ankle swelling.  Id. at 360, 362, 725, 915, 1455-56, 1461.  Her ESR was slightly elevated.  Id. at 797, 1000, 1365.  Dr. Anuntiyo prescribed methotrexate.  Id. at 363, 727, 917, 1457.

In July and September 2012, Plaintiff showed improvement while on methotrexate.  Id. at 340, 343, 353, 711, 713, 720-21, 785, 796, 901, 903, 910-11, 981, 992, 1353, 1361, 1441, 1443, 1450-51.  By late 2012 into early 2013, Plaintiff's symptoms increased after tapering off prednisone.  Id. at 691, 700, 784, 881, 890-91, 977, 1077, 1347, 1421, 1430.  She complained of joint pain and stiffness and increased pain in her hips and knees.  Id.

15

In June 2013, Plaintiff's ESR was high at 45 and she was feeling worse with more stiffness and body aches. Id. at 379, 680, 773, 870, 969, 1066, 1138, 1340, 1410. She exhibited tenderness in all 28 joints associated with rheumatoid arthritis ("RA"), as well as all 18 fibromyalgia tender points. Id. at 681, 871, 1067, 1411.

In July 2013, Plaintiff was feeling worse since decreasing methotrexate, and was experiencing more pain and stiffness in her fingers. Id. at 675, 865, 1061, 1405. She again exhibited tenderness in all 28 RA joints, as well as all 18 fibromyalgia tender points. Id. at 676, 866, 1062, 1406. Her ESR remained high. Id. at 963, 1127, 1332. Dr. Anuntiyo suspected systemic lupus erythematosus based on Plaintiff's treatment history. Id. at 1407

In September 2013, Plaintiff's ESR was higher. Id. at 854, 949, 1050, 1113, 1318, 1394. She exhibited tenderness in all 28 RA joints and 18 fibromyalgia tender points, despite use of methotrexate and prednisone. Id. at 855, 1050-51, 1395.

In November 2013, Plaintiff exhibited tenderness in all 28 RA joints and Dr. Anuntiyo prescribed Enbrel injections. Id. at 646-47, 650-51, 837, 840-41, 1033-34, 1036, 1242, 1380. At that time, Plaintiff's ESR was "still high" and the prescribed methotrexate was no longer helping. Id. at 649, 839, 1035, 1379. Dr. Anuntiyo noted that a diagnosis of inflammatory spondyloarthropathy seemed more likely due to Plaintiff's symptoms and that systemic lupus erythematosus seemed less likely given her poor response to medication. Id. at 841, 1037, 1381.

In December 2013, Plaintiff reported less body pain and stiffness with the use of Enbrel, but her ESR remained slightly elevated. Id. at 827, 1023, 1093, 1232, 1298. She still exhibited tenderness in all 18 fibromyalgia tender points. Id. at 828, 1024, 1233. Dr. Anuntiyo suggested psoriatic arthritis was a possible diagnosis. Id. at 829, 1025, 1234.

In January 2014, Dr. Anuntiyo completed an impairment questionnaire regarding Plaintiff's physical capacity. Id. at 1006-10. Dr. Anuntiyo reported Plaintiff suffered from undifferentiated connective tissue disease with possible

psoriatic arthritis.  Id. at 1006.  He explained his diagnoses were supported by Plaintiff's elevated ESR, body stiffness, and low positive ANA test.  Id.  He explained Plaintiff exhibited pain in her wrist, fingers, shoulders, hip, back, knees, ankles, and toes, and that he has attempted to substitute different medications to alleviate Plaintiff's symptoms.  Id. at 1007.  Dr. Anuntiyo estimated Plaintiff could perform a job in a seated position for less than one hour a day.  Similarly, he estimated Plaintiff could perform a job standing or walking for less than one hour a day.  Id. at 1008.  He stated Plaintiff would have to get up from a seated position every 30 minutes and could not return to the seated position for 30 minutes.  Id. He reported Plaintiff could never or rarely lift any amount of weight; grasp, turn, or twist with her hands; use her hands or fingers for fine manipulation; or use her arms for reaching.  Id. at 1008-09.  Dr. Anuntiyo estimated Plaintiff's symptoms would interfere with her attention and concentration for about 1/3 to 2/3 of her work day.  Id. at 1009.  He stated Plaintiff would need to take unscheduled 30-minute breaks every 30 minutes throughout the workday, and would be absent from work more than three times a month due to her symptoms and treatment.  Id. at 1009-10.

In February 2014, Plaintiff did not exhibit any joint tenderness.  Id. at 1015, 1224.  However, her ESR was again elevated.  Id. at 1087, 1292.  In March 2014, Plaintiff was not taking prednisone and exhibited increased swelling in her arms and legs.  Id. at 1218.  Her ESR remained elevated.  Id. at 1282.  By April 2014, Plaintiff showed tenderness in all 28 RA joints and all 18 fibromyalgia tender points.  Id. at 1214.  Her ESR continued to be elevated.  Id. at 1276.

In May 2014, Dr. Anuntiyo completed a lupus impairment questionnaire.  Id. at 1156-62.  He reported Plaintiff met the diagnostic criteria for systemic lupus erythematosus, based on her photosensitivity, oral ulcers, arthritis, anti-DNA antibody, positive test for ANA, and an ESR above 50.  Id. at 1157-58.  He described Plaintiff's symptoms to include fever, abdominal pain,

diarrhea/constipation, headache, nausea/emesis, urinary urgency or incontinence, heartburn, fatigue, anemia, ankle swelling, trouble sleeping, arthralgia, and arthritis. Id. at 1158-59. Dr. Anuntiyo estimated Plaintiff's physical capacity to be similar to what he described in his January 2014 questionnaire, except that he estimated she would need to take unscheduled 15-minute breaks every hour. Id. at 1159-61.

In June 2014, Plaintiff complained of feet pain and swelling after decreasing her Enbrel. Her ESR was slightly higher. Id. at 1210, 1270. In August 2014, Plaintiff showed tenderness in her hands, wrists, shoulders, knees, and ankles. Id. at 1206. Her ESR remained elevated. Id. at 1258.

In October 2014, Plaintiff's ESR was still slightly elevated, but better. Id. at 1202, 1253. She still complained of experiencing increased stiffness. Id. at 1202. She exhibited tenderness in all 28 RA joints and all 18 fibromyalgia tender points. Id. at 1203. Plaintiff seemed to be showing improvement on Enbrel. Id. at 1204.

In December 2014, Plaintiff complained of feeling more pain when she did not take Enbrel. Id. at 1193. She exhibited tenderness in all 28 RA joints. Id. at 1194. Her ESR remained slightly elevated. Id. at 1376.

In May 2015, Plaintiff complained of pain "all over" and poor sleep. Id. at 1591. She continued to show tenderness in all 18 fibromyalgia tender points, as she did in July 2015 as well. Id. at 1589, 1591.

> **(b)** **Non-Examining Agency Physician's Findings and Opinions**

In January 2014, non-examining agency physician Barbara Cochran, M.D. reviewed Plaintiff's medical record and assessed her physical residual functional capacity, as follows: Plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk for a total of four hours in a workday; sit for a total of six hours in a workday; push, pull, and balance an unlimited amount; frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds;

occasionally stoop, kneel, crouch, and crawl; and avoid a concentrated exposure to hazards.  Id. at 107-09.

### (c)    ALJ's Rejection of Dr. Anuntiyo's Opinion

The ALJ rejected the findings and opinions of treating physician, Dr. Anuntiyo, and instead gave great weight to consultative physician, Dr. Barbara Cochran, noting "the opinion of Dr. Cochran[] is given weight, as it is more consistent with the claimant's residual functional capacity."[6] Id. at 30.  In rejecting Dr. Anuntiyo's opinion, the ALJ found Dr. Anuntiyo's opinion (1) "consists of multiple possible diagnoses of the claimant's impairments"; (2) "is not supported by the voluminous treatment record, which is mostly unvarying despite a span of years and which report good response to medication"; and (3) "is [] inconsistent with clinical signs observed during evaluation of the claimant by both treating and evaluating physicians."  Id.

### (d)    Analysis

Dr. Anuntiyo's opinions were contradicted by Dr. Cochran's assessment. Thus, in order to reject Dr. Anuntiyo's opinions, the ALJ was required to present "specific and legitimate reasons that are supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim, 763 F.3d at 1160-61; Garrison, 759 F.3d at 1012.  As discussed below, although the ALJ presented specific reasons, the reasons were, once again, neither legitimate nor supported by substantial evidence in the record.

First, Dr. Anuntiyo's opinions are not undermined by his multiple diagnoses and Plaintiff's largely unvarying treatment record.  Dr. Anuntiyo treated Plaintiff

---

[6] The ALJ also gave "substantial weight" to the findings of consultative examining physician Soheila Benrazavi, M.D., but rejected her functional capacity assessment, and that of non-examining agency physician J. Zheutlin, because "they are excessive in light of the record as a whole, which shows that the claimant is more limited physically."  Id. at 30.  Plaintiff does not challenge the ALJ's rejection of these examining sources.

for a complicated rheumatological disorder, which presented with symptoms indicative of multiple possible diagnoses.  He routinely reassessed Plaintiff as her symptoms worsened or improved, and medications either worked or failed.  AR at 369, 377-78, 732, 829, 841, 922, 928, 1025, 1037, 1234, 1381, 1407, 1467.  Under these circumstances, it is not surprising Dr. Anuntiyo reported multiple possible diagnoses throughout the course of Plaintiff's treatment, even as her general symptoms remained the same.

Second, the ALJ's suggestion the record does not support Dr. Anuntiyo's assessment is unfounded.  As discussed in detail above, Dr. Anuntiyo treated Plaintiff for several years and reported significant clinical findings, which were supported by laboratory testing.  Significantly, Plaintiff consistently exhibited tenderness in the RA joints and the tender points associated with fibromyalgia.  Id. at 372, 646-47, 650-51, 676, 681, 734, 828, 837, 840-41, 855, 866, 871, 924, 1024, 1033-34, 1036, 1050-51, 1062, 1067, 1194, 1203, 1214, 1233, 1242, 1380, 1395, 1406, 1411, 1463, 1589, 1591.  She also showed persistent fatigue and swelling.  Id. at 347, 360, 362, 725, 736, 915, 926, 1158-59, 1218, 1455-56, 1461, 1465.  In addition, she regularly exhibited bilateral foot, ankle, knee, hip, and shoulder pain, as well as pain in her finger joints.  Id. at 312, 324, 340, 342, 362, 370, 372, 376, 701, 712, 726, 734, 738, 882, 891, 902, 916, 924, 926, 928, 1078, 1206, 1422, 1431, 1456.  Finally, Plaintiff's ESR was consistently elevated.  Id. at 370, 373, 488, 496, 513, 649, 733, 797, 827, 839, 923, 963, 1000, 1023, 1035, 1087, 1093, 1127, 1210, 1232, 1270, 1292, 1298, 1332, 1365, 1376, 1379, 1462.

Moreover, the ALJ is mistaken in his conclusion that Plaintiff showed "good response to medication."  Id. at 30.  Plaintiff showed decreased symptoms while taking a course of prednisone and methotrexate.  Id. at 340, 343, 353, 373, 513, 675, 711, 713, 720-21, 735, 785, 796, 865, 901, 903, 910-11, 925, 981, 992, 1061, 1218 1353, 1361, 1441, 1443, 1450-51, 1464.  However, despite the use of these medications, she continued to exhibit tenderness in her joints and fibromyalgia tender points.  Id.

20

at 855, 150-51, 1395. Further, after five months of use, the methotrexate was no longer helping. Id. at 649, 839, 1035, 1379. Similarly, Plaintiff also saw some relief from Enbrel, id. at 1202, 1253, 1293, but still presented with an elevated ESR and tenderness in her joints and fibromyalgia tender points, id. at 827-28, 1023-24, 1093, 1194, 1203, 1232-33, 1298, 1376, 1589, 1591.

Finally, as with the ALJ's analysis of Dr. Kin's opinions, the fact that Dr. Anuntiyo's findings "were inconsistent with clinical signs observed by both treating and evaluating physicians" merely triggered the ALJ's burden to present specific and legitimate reasons for rejecting Dr. Anuntiyo's opinions. Id. at 30. The inconsistencies themselves do not support the rejection of Dr. Anuntiyo's findings. See Orn, 495 F.3d at 633.

## IX.

### RELIEF

**A.  APPLICABLE LAW**

"When an ALJ's denial of benefits is not supported by the record, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Hill v. Astrue, 698 F.3d 1153, 1162 (9th Cir. 2012) (citation omitted). "We may exercise our discretion and direct an award of benefits where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed." Id. (citation omitted). "Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." Id. (citations omitted); see also Reddick v. Chater, 157 F.3d 715, 729 (9th Cir. 1998) ("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits.").

///

**B.    ANALYSIS**

     In this case, the record has not been fully developed.  The ALJ must provide specific and legitimate reasons for rejecting the medical opinions of Dr. Kin and Dr. Anuntiyo.  Accordingly, remand for further proceedings is appropriate.

**X.**

**<u>CONCLUSION</u>**

     For the foregoing reasons, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this action for further proceedings consistent with this Order.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.


 Dated: May 03, 2017

HONORABLE KENLY KIYA KATO
United States Magistrate Judge